DIAZ, Circuit Judge,
concurring in part and dissenting in part:
When they convened in Philadelphia in May 1787 for the Constitutional Convention, the Framers understood that they were engaged in something more than a drafting exercise. Their effort was an inspired work following a debate for the ages about the role of government, its relationship to the people, and — as we consider today — the division of power among its coordinate branches. These consolidated appeals require us to interpret the Recess Appointments Clause of Article II of the Constitution, which received little attention or discussion at the Founding, and yet serves as a linchpin of the division of power between the President and the Senate.
I am pleased to join my colleagues’ resolution of these cases as to the merits of the National Labor Relations Act issues, contained in parts I, II, and III of the majority opinion. But I part company with my friends on the constitutional questions before us.[1] In interpreting the Recess Appointments Clause, we must be mindful of the Framers’ intent in drafting it: to ensure a functioning government and maintain the separation of powers between the executive and legislative branches of that government. With this purpose fixed firmly in mind, and for the reasons I explain below, I find no constitutional defect *663 in President Barack Obama’s intrasession recess appointments of National Labor Relations Board (“NLRB” or the “Board”) Members Sharon Block, Terence Flynn, and Richard Griffin, Jr.
I.
These appeals originate from the Senate’s unanimous consent resolution to “adjourn and convene for pro forma sessions only, with no business conducted,” between December 20, 2011 and January 23, 2012. 157 Cong. Rec. S 8783-03 (daily ed. Dec. 17, 2011). These pro forma sessions were necessary, at least in part, because the House of Representatives, relying on the Adjournments Clause of the Constitution,[2] refused to give consent for the Senate to take its normal extended intersession recess. See NLRB v. New Vista Nursing and Rehabilitation, LLC, 719 F.3d 203, 216 n. 6, Nos. 11-3440, 12-1027, 12-1936, 2013 WL 2099742, at *32 n. 6 (3d Cir. May 16, 2013) (Greenaway, J., dissenting) (citing Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions, 36 Op. O.L.C. 1, 2-3 (2012)). As a result, the pro forma sessions created two intrasession recesses: one lasting from December 17, 2011, to January 2, 2012, and another lasting from January 3 (when a new session of Congress began) to January 23, 2012.
Each Tuesday and Friday during these periods, a single senator took to the floor to convene and adjourn each pro forma session, which typically lasted for no more than a minute. The Senate did not say a prayer or recite the Pledge of Allegiance during these sessions, see 158 Cong. Rec. S3-11 (daily eds. Jan. 6-20, 2012), nor did it receive messages from the President or the House, see 158 Cong. Rec. S37 (daily ed. Jan. 23, 2012). During one such session, the Senate agreed by unanimous consent to the payroll tax extension, see 157 Cong. Rec. S 8789 (daily ed. Dec. 23, 2011), which the President signed into law that same day.
On January 3, 2012, Board Member Craig Becker’s recess appointment term ended, leaving the Board without a quorum. President Obama had nominated Sharon Block and Richard Griffin to the Board on December 14, 2011, but the Senate had not yet voted on their nominations before recessing on December 17. On January 4, the President, apparently concluding that the Senate had entered “the Recess” despite its pro forma sessions, appointed Members Block, Griffin, and Flynn using his recess appointment power. See Press Release, The White House, President Obama Announces Recess Appointments to Key Administration Posts (Jan. 4, 2012), available at http://www. whitehouse.gov/the-press-office/2012/01/04/ president-obama-announces-recessappointments-key-administration-posts.
The President acted pursuant to the Recess Appointments Clause, which gives him the “Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting the Commissions which shall expire at the End of their next Session.” U.S. Const. art. II, § 2, cl. 3. The majority says that, as used in the clause, “the Recess” refers to the break between the end of one regular session of the Senate and the convening of the next (the so-called “intersession recess”). Because the Senate was not in an intersession recess when the President made his appointments, the majority holds that they are constitutionally invalid. As the Board notes, this view of the Recess Appoint *664 ments Clause also deems invalid over 500 appointments by fourteen Presidents dating back to the 1860s. See NLRB Supp. Br. 17.
The majority’s definition of “the Recess” presumes a textual clarity not found in the clause and, more importantly, upsets the Framers’ carefully crafted allocation of power between the President and the Senate in the appointments process. I would hold instead that “the Recess” “refers to both intra- and intersession recesses because the Senate can be unavailable to provide advice and consent during both.” New Vista, 719 F.3d at 245, 2013 WL 2099742, at *30 (Greenaway, J., dissenting). Interpreting the clause as I propose, that is, with an eye to its original purpose, lends a pragmatic understanding of the scope of the authority it confers, while maintaining the delicate balance of power that the Framers intended. Because the majority’s reading of the clause is not supported by the language itself and is unworkable in practice, I respectfully dissent from parts IV and V of the opinion.
II.
The Appointments Clause of the Constitution provides that the President shall nominate, “and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States[.]” U.S. Const. art. II, § 2, cl. 2. Recognizing that it would be impractical for the Senate to remain perpetually in session to consider presidential nominees, The Federalist No. 67, at 410 (Alexander Hamilton) (C. Rossiter ed., 1961), the Framers also gave the President the power to make recess appointments.
The majority has accurately summarized the law supporting the conflicting interpretations of the Recess Appointments Clause: the first, championed by the Employers and recently embraced by the Third and D.C. Circuits,[3] reads the clause so as to allow the President to make recess appointments only during an intersession recess, while the second, favored by the Board and by the Second, Ninth, and Eleventh Circuits,[4] as well as by Judge Greenaway in dissent in New Vista, maintains that the President’s power to appoint extends to recesses generally, no matter when they occur.[5] I find the latter reading — also termed the “functional approach” [6] — to be more persuasive.
A.
The first rule of constitutional interpretation is, of course, to apply the plain meaning of the text. McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892); see also District of Columbia v. Heller, 554 U.S. 570, 576, 128 S.Ct. 2783, *665 171 L.Ed.2d 637 (2008) (“In interpreting [the] text, we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.” (internal quotations omitted)).
The problem with a textualist view of the Recess Appointments Clause is that the language, while sparse, is anything but clear. See New Vista, 719 F.3d at 221, 2013 WL 2099742, at *13 (“The word ‘recess’ lacks a natural meaning that clearly identifies whether it includes only intersession breaks or also includes intrasession breaks, whether they be of a certain duration or a period of unavailability.”). Most Americans would understand a “recess” to be a break from something — in this case a break from Senate proceedings. The question, then, becomes whether the Framers’ use of the definite article (i.e., “the”) as a modifier was intended to denominate a particular type of break.
I think it a stretch to say that the plain language of the clause shows that the Framers intended to limit the President’s recess appointment power to the singular period between two congressional sessions. If that were so, then it would stand to reason that the other use of “the Recess” in the Constitution — in Article I, Section 3, Clause 2,[7] which provides for the temporary appointment of Senators by state executives during their legislatures’ recesses — would have the same singular meaning. Yet we know that is not so because in that latter context, the clause is used to refer collectively to the various recesses of the several state legislatures. The Constitution also refers repeatedly to “the Congress” and “the President,” yet I doubt the majority ascribes the same literal meaning to the definite article in these contexts.
Perhaps the Framers’ use of the definite article has some unique meaning in this context, but there is nothing in the clause that points unambiguously to the majority’s view of things. It seems to me equally plausible that the Framers choice of words was intended to exclude other types of recesses — for example, when the Senate breaks for lunch by recessing. Alternatively, as the en banc Eleventh Circuit concluded in Evans, the word “the” might have also been intended to refer “generically to any one — intrasession or intersession — of the Senate’s acts of recessing, that is, taking a break.” 387 F.3d at 1225.
Furthermore, the majority’s reading does more than simply give meaning to the word “the” — it also requires the court to inject an additional modifier into the Constitution, a practice that the Supreme Court has disfavored. See The Pocket Veto Case, 279 U.S. 655, 679, 49 S.Ct. 463, 73 L.Ed. 894 (1929). As Judge Greenaway notes in his dissent in New Vista, the majority’s reading necessitates that one insert “intersession” before “Recess” in the clause. New Vista, 719 F.3d at 249, 2013 WL 2099742, at *34. By contrast, a functional view of the clause does not require an additional modifier, because “the Recess” would refer without qualification to any break from Senate business when that body is functionally unavailable to give advice and consent.
The majority also concludes that because “adjourn” and “adjournment” are used elsewhere in the Constitution to refer to various types of congressional breaks, including intrasession recesses, “the Recess” must refer to a specific suspension of business: an intersession recess. The ma *666 jority is correct that “adjourn” is used throughout the Constitution as a broader term than “the Recess.” On that point, the Adjournments Clause of the Constitution demonstrates that an adjournment may either be very short — for example, a break from day to day — or much longer. See U.S. Const. art. I, § 5, cl. 4 (providing that “during the Session of Congress” neither House may “adjourn for more than three days” without the “consent of the other”). However, I fail to see how this fact logically leads to the conclusion that all intrasession breaks are excluded from “the Recess.” The notion that the distinction between adjournments and “the Recess” applies with equal force to intra- and intersession recesses is a convenient correlation, but it has no basis in the text of the Constitution.
Nor does the balance of the clause shed further light on the question before us. The Employers argue that because the clause mandates that recess appointments expire at the end of Congress’s “next session,” the President’s power to appoint necessarily must be limited to intersession recesses. Otherwise, they say, two recess appointees could have widely disparate tenures — that is, the President could appoint one official during an intrasession recess and another months later, during a subsequent intersession recess, yet both appointments would expire at the same time: the end of the next session.
But nothing in the Recess Appointments Clause requires that all recess appointments be of the same length, and such an interpretation does not further its purpose. “The check on the Recess Appointments Clause ... is that recess appointments have a fixed end, not necessarily a fixed length.” New Vista, 719 F.3d at 262-63, 2013 WL 2099742, at *45 (Greenaway, J., dissenting). In that regard, I agree with Judge Greenaway that the Framers likely expected that recess appointments, even those made between sessions, would have varying durations, particularly given that intersession recesses in the nation’s early years routinely lasted six months or longer. See id.
B.
Finding the clause’s text inconclusive, I turn to consider its purpose. The Supreme Court has embraced this approach, often looking to the spirit and purpose of the language for guidance when constitutional text is ambiguous. See, e.g., Polar Tankers, Inc. v. City of Valdez, 557 U.S. 1, 6-7, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009) (noting that “[t]he Court over the course of many years has consistently interpreted the language of the [Tonnage Clause] in light of its purpose____”); Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (“We have accordingly interpreted the Confrontation Clause in a manner sensitive to its purposes .... ”); Tashjian v. Republican Party of Conn., 479 U.S. 208, 227, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (“Our inquiry begins with an examination of the Framers’ purpose in enacting the first Qualifications Clause.”).[8]
*667 Although The Federalist Papers are indispensable in ascertaining many aspects of the Framers’ intent and purpose, they reveal precious little about the Recess Appointments Clause, which was adopted without debate. It is undisputed, however, that the clause’s purpose was to “establish! ] an auxiliary method of appointment, in cases to which the general method was inadequate.” The Federalist No. 67, at 409. The power was designed to work in concert with the Appointments Clause, which allows the President to fill vacancies with the advice and consent of the Senate.
Alexander Hamilton offered a succinct rationale for the recess appointment power, stating that “it might be necessary for the public service [for the President] to fill [vacancies] without delay.” Id. at 410. Such a view is consistent with the Executive’s separate constitutional duty to “take Care that the Laws be faithfully executed,” U.S. Const. art. II, § 3, cl. 5, which in turn requires that the President have in place the principal officers necessary to carry out this mandate.
To that end, I submit that the Framers intended to place the power of appointment chiefly in the President. In The Federalist No. 76 for example, Hamilton explained that “one man of discernment is better fitted to analyze and estimate the peculiar qualities adapted to particular offices than a body of men of equal or perhaps even of superior discernment.” The Federalist No. 76, at 455 (Alexander Hamilton) (C. Rossiter ed., 1961).
The Framers no doubt intended the Senate to play a significant role in the process, but its duty primarily was to ferret out appointments doled out based upon favoritism or corruption, and certainly not to weigh the executive’s policy choice and impede the selection to an extent that risks shutting down entire agencies of the government. As Hamilton described it, “[The Senate] would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity.” Id. at 457; see also Myers v. United States, 272 U.S. 52, 118, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (stating that the Senate’s advice and consent role should be “strictly construed” and not “enlarged beyond words used”).
Thus, while Hamilton described the recess power as an “auxiliary method of appointment,” The Federalist No. 67, at 409, his broader view of the coordinate branches’ respective roles in the process shows that the power was intended primarily for the President, and that the recess appointment power in particular was a practical aid in support of the President’s constitutional obligations as the nation’s chief executive.
Against this backdrop, I discern a meaning of “the Recess” that I believe would find favor with the Framers: the Senate is in “the Recess” when it is not available to provide advice and consent on nominations. Particularly, if the Senate is not engaged in its regular course of business, is unavailable to receive messages from the President, or cannot meet to consider a nominee for a position, it is in “the Recess.” I note that this is not a test foreign to Congress; indeed the Senate Judiciary Committee long ago opined that “the Recess” denotes “a period of time when the Senate is not sitting in regular or extraordinary session ... when its chamber is empty!,] when, because of its absence, it cannot receive communications from the President or participate as a body in making appointments.” S.Rep. No. 58-4389, at 2 (1905).
*668 My view of the clause thus does not distinguish between intrasession and intersession recesses, because such a distinction, while perhaps grist for wordsmiths, is meaningless in the context of the recess power’s core purpose — to ensure the proper functioning of the government. Whatever label one chooses to affix to “the Recess,” so long as the Senate is unable to provide its advice and consent on the President’s nominees, the result is the same: important offices remain unfilled and the government does not function as intended.
III.
The majority contends that its interpretation of the Recess Appointments Clause should be favored because it is consistent with the historical record. But a closer look at the conduct of the coordinate branches, both past and present, reveals that the functional approach not only fits with historical practice, but also better sustains the balance of powers inherent in our constitutional structure.
A.
Relying on Nod Canning, the majority posits that “the infrequency of intrasession appointments in the historical record and the relative disdain harbored toward such appointments in at least the first 132 years of our Nation suggests an ‘absence of [the] power’ to make such appointments.” Maj. Op. at 650 (quoting Noel Canning, 705 F.3d at 502). In my view though, a functional interpretation of the Recess Appointments Clause properly counsels against a blind adherence to the precise procedural conditions in which earlier executives exercised the power. In any event, I do not think the majority’s “use it or lose it” theory of constitutional interpretation is dispositive, particularly since the relevant history purporting to support it is not so compelling.
In the infancy of our republic, the Senate rarely took intrasession recesses, instead working steadily while in Washington and opting to take lengthy intersession recesses — sometimes lasting six to nine months — to return home to family and constituents. See Congressional Directory for the 112th Congress 522-38 (2011). Travel for those early legislators was both arduous and treacherous, creating an additional disincentive to take additional breaks during a session. Thus, “until the Civil War, there were no intrasession recesses longer than 14 days, and only a handful that even exceeded three days.” NLRB Supp. Br. 12 (citing Congressional Directory for the 112th Congress 522-25 (2011)).
The first time that Congress took an extended intrasession recess — from April 20, 1867 to July 3, 1867 — President Andrew Johnson made the first known intrasession recess appointment. Edward A. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 408-09 (2005). President Johnson made other intrasession recess appointments during his tenure, including one whose legitimacy was later challenged in — and upheld by — the Court of Claims.[9] Id. at 409 (citing Gould v. United States, 19 Ct.Cl. 593 (1884)).
*669 As the country’s transportation infrastructure improved substantially in the 20th century, it became easier for Senators to travel quickly and easily between the Capitol and their home states; this, in turn, has led to more intrasession breaks at the expense of the traditional extended intersession recess. Indeed, intrasession recesses today often last longer than intersession ones. See Evans, 387 F.3d at 1226 & n. 10 (noting that the Senate has taken “zero-day intersession recesses” as well as “intrasession recesses lasting months”). The net result is that in modern Senate practice, intrasession recesses account for more of the Senate’s absences than intersession recesses. See Congressional Directory for the 112th Congress 580-37 (2011).
I therefore attach little, if any, negative constitutional significance to the historical fact that since 1947, presidents from both parties have made over 400 intrasession appointments. See New Vista, 719 F.3d at 261-62, 2013 WL 2099742, at *44 (Greenaway, J., dissenting). Yet the majority’s fixation on bygone history — at the expense of the reality that informs recess appointment practices today — effectively deems every single one of those appointments to be constitutionally infirm.
I do not suggest that history should be ignored as a tool of constitutional interpretation. But one need only read the fine briefs in these cases to recognize that, given time, savvy lawyers can excavate historical references to support virtually any proposition.[10] Compare NLRB Supp. Br. 9 (noting that George Washington once referred to an intrasession break as “the recess” in a letter to John Jay), and NLRB Supp. Br. 9 (arguing that the eighteenth-century Pennsylvania and Vermont state constitutions supported the “intrasession” definition of “recess”), with Resp’ts’ Supp. Br. 14-15 (citing Judge Barkett’s dissent in Evans in which she notes George Washington’s reference to an intersession break as “the recess” in a message to Congress) and Resp’ts’ Supp. Br. 15 (arguing that the Massachusetts and North Carolina state constitutions supported the “intersession” definition).
Rather than impute dubious meaning to sparse text or ascribe consistency to what is, at best, ambiguous historical practice, I would look to the purpose of the clause as our lodestar. To that end, we would do well to remember that
[t]ime works changes, brings into existence new conditions and purposes. Therefore, a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice John Marshall, ‘designed to approach immortality as nearly as human institutions can approach it.’ The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contempla *670 tion cannot be only of what has been, but of what may be.
Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910) (quoting Cohens v. Virginia, 19 U.S. 264, 387, 6 Wheat. 264, 5 L.Ed. 257 (1821)).
Viewed in this practical light, the Recess Appointments Clause sheds the ambiguity of its text in favor of a meaning that promotes its core function. I would therefore hold that “the Recess” refers to recesses generally, no matter the type, as long as the Senate is not engaged in its regular business and is unable to perform its constitutional duty of providing advice and consent on the President’s nominees.
B.
Admittedly, a functional view of the President’s recess appointment power does not fix a minimum length for the Senate’s break in business to constitute “the Recess.” But the majority’s own reading of the clause fares no better. Under its interpretation, “the Recess” authorizing the President to act occurs only when Congress breaks between sessions, without regard to whether the break spans weeks, days, or hours. Thus, if Congress takes a one-day break between sessions, the majority apparently would find no fault with the President making a recess appointment during that time, despite the fact that the Senate would have returned to business the next day and been available to provide its advice and consent on the nominee.
Nor would the majority’s interpretation prevent the President from making hundreds of recess appointments during a momentary intersession recess. Indeed, I note with some irony that the sole instance in which a President assumed such audacious power occurred in 1903 when President Theodore Roosevelt “used a moment’s intersession recess ... to make 193 executive branch appointments, literally between two raps of a gavel.” Peter M. Shane, Third Circuit Further Fuels the Constitutional Conflict Over Recess Appointments, U.S. Law Week, June 11, 2013. The majority’s decision today would do nothing to stop a future President from channeling the Rough Rider.
Certainly, we should not ignore the possibility that the President might abuse his power to appoint officials in the manner suggested by the Employers here. But the majority appears eager to assume the worse from the nation’s chief executive. I, for one, decline to “imput[e] to the President a degree of turpitude entirely inconsistent with the character which his office implies, as well as with the high responsibility and short tenure annexed to that office.” Allocco, 305 F.2d at 714 (quoting Exec. Auth. to Fill Vacancies, 1 Op. Att’y Gen. 631, 634 (1823)). After all, “[t]here is [also] no text limiting the laws a President may veto (or his reasons for vetoing them), the pardons he may issue, or the occasions on which he may convene Congress on his own initiative.” Shane, Third Circuit Further Fuels the Constitutional Conflict Over Recess Appointments, U.S. Law Week, June 11, 2013. We should nonetheless expect some modicum of good faith in the individual our fellow citizens elect to the most powerful office in the world, otherwise his “textual powers are quite adequate, if asserted irresponsibly, to undermine both Congress and the judiciary.” Id.
In any event, there are checks in our constitutional structure, both explicit and implicit, that protect against just such abuse. To begin with, the President may make recess appointments only when the Senate is not in session for regular business. If the Senate wishes to give its advice and consent as to particular nominees, it may remain in regular session for that purpose. Second, the very fact that *671 all recess appointments are temporary restrains the President’s power. Third, the President has a substantial interest in obtaining the Senate’s advice and consent for full terms for the principal officers he nominates to implement the administration’s agenda, rather than relying on short-term recess appointees. Fourth, as Judge Greenaway notes in his dissent in New Vista, “the structure of the branches of government, as conceived by the Constitution, give[s] the President a very strong interest in maintaining the favor of the Senate and not stoking its ire.” New Vista, 719 F.3d at 258, 2013 WL 2099742, at *41. (citing The Federalist No. 77, at 459 (Alexander Hamilton) (C. Rossiter ed., 1961)).[11] The President also must consider public opinion, as an executive who abuses his power will damage his reputation, as well as that of his party. See id.
The majority also gives short shrift to the fact that the President too swears an oath to uphold the Constitution, and that when he acts under its express authority, his actions should be accorded a presumption of constitutionality. See Evans, 387 F.3d at 1222 (citing United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). The Supreme Court has further underscored the necessity of the legislative branch providing some latitude to the President in his use of constitutional authority, admonishing that congressional action is invalid if it “undermine[s] the powers of the Executive Branch, or disrupt[s] the proper balance between the coordinate branches [by] preventing] the Executive Branch from accomplishing its constitutionally assigned functions.” Morrison v. Olson, 487 U.S. 654, 658, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (citations and internal quotations omitted).
But the more direct response to the claim that the functional view fails for lack of temporal limits is, so what? Limiting principles are important when courts engage in constitutional interpretation, but a slavish devotion to them at the expense of common sense is no virtue. That the Framers chose not to draw a bright line delineating the limits of the President’s recess appointment power is not a flaw, but rather a part of their grand design in drafting a compact “intended to endure for ages to come, and consequently to be adapted to the various crises of human affairs.” McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819).
In short, because any fixed time limitation has no basis in the text of the clause, it would perforce be arbitrary. See New Vista, 719 F.3d at 261-62, 2013 WL 2099742, at *44 (Greenaway, J., dissenting). The proper test in assessing whether a “Recess” triggers the President’s power to appoint is whether the Senate is engaged in its regular business and thus available to give its advice and consent: this inquiry operates to exclude the altogether silly scenario of the President making recess appointments during the Senate’s breaks for meals or weekends, while including the types of weeks-long intrasession recesses that could stall the functioning of government if an important post is left vacant.
As the majority would have it, the Senate is free to read out of the Constitution the President’s recess appointment power by refusing to take intersession recesses, opting instead to take an extended intrasession break, returning just before the session ends, and then moving directly into the next session. Even though the harm to the country of leaving vital offices un *672 filled while the Senate is away and unable to give advice and consent is no less compelling in this scenario, the President would be powerless to act. The Supreme Court has long made clear, however, that no clause should be interpreted in a manner that would render it meaningless. See Marbury v. Madison, 5 U.S. 137, 174, 1 Cranch 137, 2 L.Ed. 60 (1803) (“It cannot be presumed that any clause in the constitution is intended to be without effect. ...”).
This concern is far from hypothetical, as the NLRB’s history of vacancies demonstrates. Despite nominations made by Presidents of both parties, the NLRB has not had a full panel of Senate-confirmed members since 2003, a problem exacerbated by the Supreme Court’s decision in New Process Steel LP v. NLRB, 560 U.S. 674, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010), which held that the Board must have at least three members in order to constitute a quorum for purposes of resolving unfair labor practice charges. Board Member and Chairman Mark Gaston Pearce’s term will expire in August of this year, see 29 U.S.C. § 153(a),[12] leaving the Board again without a quorum unless the President’s nominees are confirmed by the Senate. It is this precise scenario, that is, where an appointment vacuum (whatever its origins) impedes the enforcement of a statute — in these cases one designed “to protect the rights of employees and employers, to encourage collective bargaining, and to curtail certain private sector labor and management practices, which can harm the general welfare of workers, businesses and the U.S. economy,” [13] — that the President’s recess appointment power was designed to remedy.
To make matters worse, while the majority claims that its reading simply restores the Senate’s power in the appointments process, it actually gives the House of Representatives a de facto veto on presidential recess appointments. The Adjournments Clause provides that neither House of Congress may adjourn for more than three days without mutual consent. See U.S. Const. art. I, § 5, cl. 4. Its purpose is to allow the business of Congress to be conducted by preventing either House to adjourn for an extended period without the other’s consent. But these appeals are before us precisely because the House has wielded this power in part to block intrasession recess appointments by refusing to adjourn, thereby forcing the Senate to rely on pro forma sessions to allow its members to break for significant periods of time. See New Vista, 719 F.3d at 261-62 n. 26, 2013 WL 2099742, at *32 n. 6 (Greenaway, J., dissenting).
Under the majority’s holding, the House has effectively gained a check on the President’s appointment power, a proposition neither contemplated by the Constitution nor intended by the Framers. See id. at 247-48, 2013 WL 2099742 at *34 (stating that the House should not “interfere with the appointments process because ‘[a] body so fluctuating and at the same time so numerous can never be deemed proper for the exercise of that power’ ”) (quoting The Federalist No. 77, at 463 (Alexander Hamilton) (C. Rossiter ed., 1961)).
The majority contends that the President may override this House “veto” by invoking his power to force an adjournment of Congress, thus creating an intersession recess during which he could make appointments. See U.S. Const. art. II, § 2, cl. 3; Todd Garvey et al., Cong. Res. *673 Serv., The Recess Appointment Power After Noel Canning v. NLRB: Constitutional Implications (Mar. 27, 2013). It appears, however, that no President has ever exercised this power, and it is unclear how it would be determined that the House and Senate are truly in “disagreement ... with respect to the Time of Adjournment.” In any event, I confess to some surprise that the majority has taken this tack, as it runs counter to their view of the President’s authority in two ways: First, it would allow the President to decide when the Senate is in “the Recess,” thereby granting the President the precise unilateral power of appointment that the majority finds objectionable. Second, given the majority’s clear distinction between an “adjournment” and “the Recess,” see Maj. Op. at 648, even if the President forced an adjournment of Congress, presumably the majority would not countenance the President’s use of the recess appointment power during the resulting break.
The majority also claims that the functional approach interferes with the Senate’s ability to regulate its own procedure. Not so. My reading of the Recess Appointments Clause would not prevent the Senate from engaging in any practice, including its use of pro forma sessions. Indeed, I recognize that such practices may be necessary for the Senate to conform to the requirements of the Adjournments Clause. But “[t]he Senate cannot be both unavailable and yet force the President to submit to its advice and consent.” New Vista, 719 F.3d at 259, 2013 WL 2099742, at *42 (Greenaway, J., dissenting). Put another way, we should not allow the Senate to determine the effect of such actions on a coordinate branch. Rather, while the Senate may meet in pro forma sessions when its members see fit, the President may also choose to use his recess appointment power during such sessions if the Senate is practically unavailable to provide its advice and consent for nominees.
Finally, I find no merit to the Employers’ argument that the Senate was, in fact, available to provide advice and consent during the relevant period due to its passing the payroll tax extension legislation on December 23, 2011. To begin with, Congress began a new session on January 3, 2012, and therefore this legislative action took place during a different intrasession recess than the one in which the President made his appointments. Thus, even assuming that the Senate had been available during the December intrasession recess, that fact has no bearing on whether it could act on a nomination during a subsequent break. Second, the payroll tax extension was an extraordinary bill that was part of a broader legislative effort to avert a national financial catastrophe, and was passed by unanimous consent, thus not requiring the Senate to return to Washington. See 157 Cong. Rec. S 8789-03 (daily ed. Dec. 23, 2011) (statement of Sen. Harry Reid). By contrast, nominees to offices like the Board are typically subject to a confirmation hearing, followed by a vote. Considering the time and attention typically given to presidential nominees, it was reasonable for the President to assume that the Senate could not practically give its advice and consent to nominations during pro forma sessions in which (1) a lone senator gaveled the body to order for sessions lasting no more than a few minutes, (2) the Senate could not receive messages from the President, (3) no debates were held, and (4) no speeches were made. See New Vista, 719 F.3d at 248, 2013 WL 2099742, at *32 (Greenaway, J., dissenting) (‘While courts have not had occasion to articulate a standard for advice and consent, it is clear ... that provision of advice and consent cannot be perfunctory.”).
C.
Under a functional interpretation of the Recess Appointments Clause, the Senate’s *674 intrasession break during January 2012 qualifies as “the Recess.” The Senate had adopted a no-business order, 157 Cong. Rec. S 8783-07 (daily ed. Dec. 17, 2011), instead holding pro forma sessions wherein the Senate was not engaged in regular business, and thus was unable to provide its advice and consent on any nominations that the President may have presented. Therefore, I would hold that the intrasession recess from January 3, 2012, to January 23, 2012, constituted “the Recess” for purposes of the Recess Appointments Clause.
IV.
Next, I consider the Employers’ contention that a vacancy must arise during the recess in order for the President to use his recess appointment power to fill it. Because it found the interpretation of “the Recess” to be dispositive, the majority did not reach this issue.
The Employers argue that the appointments of Members Block, Flynn, and Griffin are invalid because the relevant vacancies did not arise during “the Recess of the Senate.” According to the Employers, to be filled by a recess appointment, a position must be vacated during the recess— that is, the President cannot use his power during the recess to fill a vacancy that arose while the Senate was still in session. For this proposition, the Employers rely on the Noel Canning opinion, wherein the court concluded that the plain language and history of the clause shows that “may happen” means “may arise” and is modified by “during the Recess of the Senate.” Noel Canning, 705 F.3d at 507-12.
The Board, on the other hand, claims that the clause places no such restriction on the President’s power. In its view, “may happen” means “may exist,” and therefore the President may use his authority to make recess appointments to any vacant position while the Senate is in recess. Because both the text and the purpose of the clause support its interpretation, I agree with the Board.
If “during the Recess of the Senate” modifies “may happen,” as the Employers assert, then the clause would allow the President to make recess appointments at any time, even while the Senate is in session, as long as the vacancy first arose during a recess. In effect, one would have to read “during the Recess of the Senate” twice to give the clause the Employers’ preferred meaning: once to denote when the vacancy must arise, and once again to limit when the President may exercise his recess appointment power. I decline to give the text of the clause such a convoluted meaning. See Woodley, 751 F.2d at 1012 (noting that the “may arise” interpretation “conflicts with a common sense reading of the word happen, as well as the construction given to this word by the three branches of our government”).
The Board’s interpretation, by contrast, flows from a plain reading of the text. Reading “may happen” to mean “happen to exist,” one need only read “during the Recess of the Senate” once in order to reach the traditional understanding of when the President may make recess appointments.
The D.C. Circuit in Noel Canning disagrees with this reading, concluding that it renders “the operative phrase ‘that may happen’ wholly unnecessary.” 705 F.3d at 507. That is incorrect. Were the clause to read “[t]he President shall have Power to fill up all Vacancies during the Recess of the Senate,” it would imply a much broader power than the Framers intended, suggesting that the recess appointment power was on equal par with that given in the Appointments Clause. The inclusion of “that may happen” makes clear that the power is not intended to be the default *675 method of appointment, but is rather an auxiliary to be used when vacant positions could not, for some reason, be filled during the session.
Nor is the clause’s purpose served by limiting the President’s appointment authority to those vacancies that arise during a recess. It bears repeating that the Recess Appointments Clause serves to maintain a functioning government at times when the Senate is unavailable to provide its advice and consent for a nominee. As a practical matter, when a vacancy arises, the President and his advisors may take a significant amount of time to select and vet a candidate before officially presenting the nominee to the Senate. At times, this period may be longer than that which remains before the Senate’s recess.
Such was the case in Allocco, 305 F.2d 704, when a judicial vacancy arose on July 31, 1955, and the President was unable to fill the position before the Senate adjourned three days later. The court there held that the President’s recess power extended to all vacancies, regardless of when they arose, relying in part on “a long and continuous line of opinions” by the Attorneys-General of the United States, beginning in 1823, advising the President “the recess power extends to vacancies which arise while the Senate is in session.” Id. at 713.
But under the Employers’ interpretation, the President could not temporarily appoint an official to an important government post, even if the vacancy arose the day prior to the Senate’s recess, and even if the recess were expected to last for weeks or months. “It is inconceivable that the drafters of the Constitution intended to create such a manifestly undesirable situation.” Allocco, 305 F.2d at 710. Rather, the public interest lies in maintaining a functioning government, and the Board’s interpretation of the clause effects that very purpose. See Evans, 387 F.3d at 1227 (“[Ijnterpreting the phrase to prohibit the President from filling a vacancy that comes into being on the last day of a Session but to empower the President to fill a vacancy that arises immediately thereafter (on the first day of recess) contradicts what we understand to be the purpose of the Recess Appointments Clause: to keep important offices filled and the government functioning.”).[14]
This understanding of the recess appointment power has been espoused by every Attorney General confronted with the question since 1823, when Attorney General William Wirt advised President Monroe that the clause extended to all vacancies that exist during a recess, including those that arose beforehand. See, e.g., Exec. Auth. to Fill Vacancies, 1 Op. Att’y Gen. 631 (1823); President’s Power to Fill Vacancies in Recess of the Senate, 12 Op. Att’y Gen. 32 (1866); Appointments Made During the Recess of the Senate, 16 Op. Att’y Gen. 522 (1880).[15] Furthermore, *676 until this year, every circuit court to have considered this issue has endorsed that interpretation. See Evans, 387 F.3d at 1226-27 (en banc); Woodley, 751 F.2d at 1012-13 (en banc); Allocco, 305 F.2d at 709-15.
The sole outlier is Noel Canning. But the D.C. Circuit’s reasoning, in addition to running counter to nearly two hundred years of precedent and distorting the text of the clause, is squarely at odds with the clause’s purpose. As one scholar aptly notes, “[i]f the [President needs to make an appointment, and the Senate is not around, when the vacancy arose hardly matters; the point is that it must be filled now.” Michael Herz, Abandoning Recess Appointments?: A Comment on Hartnett (and Others), 26 Cardozo L.Rev. 443, 445-46 (2005) (emphasis added).
Finding that both text and purpose support the Board’s view, I conclude that “may happen” means “may exist” in the context of the Recess Appointments Clause. Therefore, the President’s recess appointments to the NLRB are valid, despite the fact that the vacancies first arose prior to the recess of the Senate.
V.
The constitutional questions before us are vexing ones, and I respect deeply my colleagues’ good faith effort to resolve them. The majority’s interpretation of the Recess Appointments Clause attempts a literal reading of the text, which it endeavors to bolster by reviewing the manner in which it claims the power was exercised during the first half of our democracy. But I can divine no textual clarity in the words of the clause, and the history of its use is muddled at best.
The majority’s view also ignores the modern recess practices of the Senate, wherein intrasession recesses have become the norm, and does violence to the fundamental purpose of the recess appointment power — to allow the President to fill up important offices and keep the government functioning. Worse, it grants the House a veto over recess appointments, a power nowhere to be found in the Constitution, and grants the Senate — through the use of a procedural artifice unworthy of the world’s greatest deliberative body — unfettered power to prevent the President from making recess appointments to fill up important offices. Indeed, the majority’s reading tilts our constitutional separation of powers far out of balance, according excessive leverage to the Congress in the appointment of government officials, at the expense of the President’s constitutional prerogative to choose those he or she deems best fit to aid in taking care that the laws be faithfully executed. It is a reading contrary to the Framers’ intent.
Under the functional interpretation of the Recess Appointments Clause that I propose, the Senate’s break from January 3 to January 23, 2012, was — pro forma sessions notwithstanding — “the Recess” for the purposes of the President’s recess appointment power because the Senate was not then available to give its advice and consent. In my view, the plain language of the clause and its fundamental purpose allow the President — as he has done here — to fill up all vacancies then- *677 existing during the Recess. On this reasoning, I would uphold the President’s appointments of Members Block, Flynn, and Griffin to the NLRB and would affirm the Board’s decisions in these appeals.
I respectfully dissent from parts IV and V of the majority opinion.

. The Board contends that Enterprise Leasing Co. and Huntington Ingalls, Inc. (the “Employers'') have waived certain constitutional arguments — namely, that “the Recess” refers to intersession recesses only and that “may happen” means "happen to arise” — by first raising them in their reply briefs. But we have discretion to consider an untimely constitutional challenge to an officer’s appointment, see Freytag v. CIR, 501 U.S. 868, 878-79, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), and considering the significance of the constitutional questions presented by these appeals, such discretion is properly exercised here. We also remedied any harm the Board would have suffered by granting both parties permission to address the arguments in supplemental briefs.

. The Adjournments Clause provides that “[njeither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days.” U.S. Const. art. I, § 5, cl. 4.

. See New Vista, 719 F.3d 203, 2013 WL 2099742; Noel Canning v. NLRB, 705 F.3d 490 (D.C.Cir.), cert. granted, - U.S. -, 133 S.Ct. 2861, - L.Ed.2d -, 2013 WL 1774240 (2013).

. See Evans v. Stephens, 387 F.3d 1220 (11th Cir.2004) (en banc); United States v. Woodley, 751 F.2d 1008 (9th Cir.1985) (enbanc); United States v. Allocco, 305 F.2d 704 (2d Cir.1962).

. The majority says that the Board espouses a third interpretation of the clause, i.e., that a break need not meet a minimum time threshold in order to be considered "the Recess.” I do not think the Board goes so far. To the contrary, the Board has specifically distinguished the instant situation from “an ordinary, long-weekend recess,” NLRB Br. 40, and aligned itself with the understanding that the clause generally excludes "very short breaks” of fewer than three days, NLRB Supp. Br. 15-16.

.See Noel Canning, 705 F.3d at 504 (calling the Board’s interpretation, as set out by Attorney General Daugherty in 1921, the "functional approach”); New Vista, 719 F.3d at 220, 2013 WL 2099742, at *12 (same).

. ”[I]f Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.” U.S. Const. art. I, § 3, cl. 2.

. The Supreme Court also applied this functional approach in a case testing the meaning of the Pocket Veto Clause. See The Pocket Veto Case, 279 U.S. at 680, 49 S.Ct. 463. There, in considering whether the Senate was available to receive a bill from the President for the purposes of the Pocket Veto Clause, the Court eschewed a myopic focus on Congress's procedural status in favor of an analysis of the underlying purpose of the clause. See id. (holding that it was immaterial to whether the Senate had “adjourned" if it was a “final adjournment” or an "interim adjournment,” and instead considering "whether [the adjournment] 'prevents' the President from returning the bill to the House in which it originated within the time allowed”). By ignoring procedural technicalities, the Court’s interpretation upheld the purpose underlying *667 the text and preserved the Framers' intended governmental structure.

. The majority is correct that the Senate took a number of intrasession recesses — typically around the Christmas holiday' — between 1867 and 1947, during which presidents did not make recess appointments. But the majority points to nothing in the historical record showing that the reason for this dearth of appointments was a concern as to the scope of the executive’s recess appointment power. It appears, rather, that the record is silent on the question., although, as Judge Greenaway points out in his dissent in New Vista, one possible explanation is that "intersession recesses [during that period] were still rather lengthy, often spanning several months, which gave the President ample time to make recess appointments during intersession recesses, compared to the relatively short duration of early intrasession recesses.” New Vis *669 ta, 719 F.3d at 263-64, 2013 WL 2099742, at *46 (Greenaway, J., dissenting).

. The same holds true for any attempt to divine an answer to the questions before us by relying on dictionary definitions of the day. Compare Evans, 387 F.3d at 1226 (citing dictionaries that define “happen” in the recess appointment clause as "to happen to be”) with id. at 1230 n. 4 (Barkett, J., dissenting) (citing dictionaries that define "happen” as "to occur”). Indeed, the parties' resort to historical and dictionary references here is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one’s friends.” Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring).

. It appears that President Obama has acknowledged and respected this interest, given that he has made but thirty-two recess appointments while in office. In contrast, his two immediate predecessors made 310 such appointments. Henry Hogue, Cong. Res. Serv., Recess Appointments: Frequently Asked Questions (Jun. 7, 2013).

. Mark Gaston Pearce, NLRB.gov, http:// www.nlrb.gov/who-we-are/board/markgaston-pearce-chairman.

. National Labor Relations Act, NLRB.gov, http://www.nlrb.gov/national-labor-relationsact.

. Congress has effectively acquiesced in the Board’s reading of the clause. The Pay Act, originally enacted during the Civil War and currently codified as 5 U.S.C. § 5503, provides for the payment of salaries to recess appointees who fill vacancies that first arise while the Senate is in session. Although the act originally postponed salaries to these appointees, Act of Feb. 9, 1863, ch. 25 § 2, 12 Stat. 642, 646, Congress subsequently amended it to permit them to be paid under certain conditions, see Act of July 11, 1940, 54 Stat. 751. In passing a law that regulated the salaries of these appointees — even if its terms display an aversion to the practice — Congress acknowledged that it was within the President’s constitutional authority to make recess appointments to pre-existing vacancies.

. One earlier opinion, from Attorney General Edmund Randolph, endorses the “happen to arise” interpretation. See Edmund Randolph, Opinion on Recess Appointments (July 7, 1792), in 24 The Papers of Thomas Jefferson 165, 165-67 (John Catanzariti ed., 1990). However, as the Board points out, not only *676 has that reading been repudiated by the long line of subsequent Attorneys-General opinions, but it is not clear that any President found it persuasive. Even George Washington, to whom the opinion was addressed, appeared to reject interpretation when he appointed William Clarke to be U.S. Attorney for Kentucky and Robert Scot to be the first Engraver of the Mint — both to vacancies that arose prior to the Senate’s recess. See S. Exec. J., 4th Cong., 2d Sess. 217 (1796); Tachau, Federal Courts in the Early Republic: Kentucky 1789-1816, at 65-73 (1979); 27 The Papers of Thomas Jefferson 192 (John Catanzariti, ed.1990); S. Exec. J., 3d Cong., 1st Sess., 142-43 (1793).