Justice Breyer
announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, and II-B-1, and an opinion with respect to Part II-B-2, in which Justice Scalia, Justice Kennedy, and Justice Ginsburg join.
The Constitution forbids a “State ... without the Consent of Congress, [to] lay any Duty of Tonnage.” Art. I, § 10, cl. 3. The city of Valdez, Alaska, has enacted an ordinance that imposes a personal property tax upon the value of large ships that travel to and from that city. We hold that the ordinance violates the Clause.
*5 I
In 1999, the city of Valdez, Alaska (City or Valdez), adopted an ordinance imposing a personal property tax upon “[bjoats and vessels of at least 95 feet in length” that regularly travel to the City, are kept or used within the City, or which annually take on at least $1 million worth of cargo or engage in other business transactions of comparable value in the City. Valdez Ordinance No. 99-17 (1999) (codified as Valdez Municipal Code §3.12.020 (2008)). The ordinance contains exceptions that, in effect, limit .the tax’s applicability primarily to large oil tankers. Ibid. And the City applies the tax in accordance with a value-allocation system that adjusts the amount owed downwards insofar as the tankers spend time in other ports. Valdez, Alaska, Resolution No. 00-15, App. to Pet. for Cert. 53a-56a.
Polar Tankers, Inc., a subsidiary of ConocoPhillips, owns vessels that transport crude oil from a terminal in the Port of Valdez (located at the southern end of the Trans Alaska Pipeline System) to refineries in California, Hawaii, and Washington. In August 2000, Polar Tankers filed a lawsuit in Alaska Superior Court challenging the tax as unconstitutional. Polar Tankers argued that the tax effectively imposed a fee on certain vessels for the privilege of entering the port; hence it amounted to a constitutionally forbidden “Duty of Tonnage.” It also argued that the tax calculation method (as applied to vessels with a tax situs elsewhere) violated the Commerce and Due Process Clauses by failing to take account of the time a ship spent at sea or being serviced or repaired. Polar Tankers said that the method thereby overstated the percentage of the ship’s total earning capacity reasonably allocated to time spent in the Port of Valdez.
The Alaska Superior Court rejected the Tonnage Clause claim, but it accepted the Commerce Clause and Due Process Clause claim. And, for that reason, it held the tax unconstitutional. On appeal, the Alaska Supreme Court, rejecting *6 both claims, upheld the tax. In respect to the Tonnage Clause claim, the Supreme Court noted that Valdez’s tax was a value-based property tax designed to pay for “services available to all taxpayers in the city,” including Polar Tankers; and it concluded that “a charge based on the value of property is not a duty of tonnage.” 182 P. 3d 614, 623 (2008) (citing Transportation Co. v. Wheeling, 99 U. S. 273 (1879)). In respect to the Commerce Clause and Due Process Clause claim, the Supreme Court held that Valdez’s allocation method was fair, hence constitutional. 182 P. 3d, at 617-622.
Polar Tankers asked us to review the Alaska Supreme Court’s determination. And we granted its petition in order to do so.
II
A
We begin, and end, with Polar Tankers’ Tonnage Clause claim. We hold that Valdez’s tax is unconstitutional because it violates that Clause. And we consequently need not consider Polar Tankers’ alternative Commerce Clause and Due Process Clause argument.
When the Framers originally wrote the Tonnage Clause, the words it uses, “Duty of Tonnage,” referred in commercial parlance to “a duty” imposed upon a ship, which duty varies according to “the internal cubic capacity of a vessel,” i. e., its tons of carrying capacity. Clyde Mallory Lines v. Alabama ex rel. State Docks Comm’n, 296 U. S. 261, 265 (1935) (citing Inman S. S. Co. v. Tinker, 94 U. S. 238, 243 (1877)); see also T. Cooley, Constitutional Limitations 596 (6th ed. 1890). Over a century ago, however, this Court found that the Framers intended those words to refer to more than “a duty” that sets a “certain rate on each ton” of capacity. Steamship Co. v. Portwardens, 6 Wall. 31, 34 (1867).
The Court over the course of many years has consistently interpreted the language of the Clause in light of its purpose, a purpose that mirrors the intent of other constitutional pro *7 visions which, like the Tonnage Clause itself, seek to “restrain the states themselves from the exercise” of the taxing power “injuriously to the interests of each other.” J. Story, Commentaries on the Constitution of the United States § 497, p. 354 (1833) (abridged version). Article I, § 10, cl. 2, for example, forbids States to “lay any Imposts or Duties on Imports or Exports.” It thereby seeks to prevent States with “convenient ports” from placing other States at an economic disadvantage by laying levies that would “ta[x] the consumption of their neighbours.” 3 Records of the Federal Convention of 1787, pp. 542, 519 (M. Farrand ed. 1966) (reprinting James Madison, Preface to Debates in the Convention of 1787 and letter from James Madison to Professor Davis, 1832). The coastal States were not to “take advantage of their favorable geographical position in order to exact a price for the use of their ports from the consumers dwelling in less advantageously situated parts of the country.” Youngstown Sheet & Tube Co. v. Bowers, 358 U. S. 534, 556-557 (1959) (Frankfurter, J., dissenting in part).
In writing the Tonnage Clause, the Framers recognized that, if “the states had been left free to tax the privilege of access by vessels to their harbors the prohibition against duties on imports and exports could have been nullified by taxing the vessels transporting the merchandise.” Clyde Mallory Lines, supra, at 265. And the Court has understood the Tonnage Clause as seeking to prevent that nullification. See Steamship Co., supra, at 34-35; see also Packet Co. v. Keokuk, 95 U. S. 80, 87 (1877); Gibbons v. Ogden, 9 Wheat. 1, 202 (1824). It has also understood the Clause as reflecting an effort to diminish a State’s ability to obtain certain geographical vessel-related tax advantages whether the vessel in question transports goods between States and foreign nations or, as here, only between the States. Compare Inman, supra (invalidating a fee applied to ships engaged in foreign commerce), with Steamship Co., supra (invalidating a tax applied to ships engaged in interstate commerce).
*8 Interpreting the Clause in light of its “intent,” id., at 34, we have read its language as forbidding a State to “do that indirectly which she is forbidden ... to do directly,” Passenger Cases, 7 How. 283, 458 (1849) (opinion of Grier, J.). Thus, we have said that the Clause, which literally forbids a State to “levy a duty or tax . . . graduated on the tonnage,” must also forbid a State to “effect the same purpose by merely changing the ratio, and graduating it on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries.” Id., at 458-459. A State cannot take what would otherwise amount to a tax on the ship’s capacity and evade the Clause by calling that tax “a charge on the owner or supercargo,” thereby “justifying] this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import.” Id., at 459.
The Court has consequently stated that the Tonnage Clause prohibits, “not only a pro rata tax . . . , but any duty on the ship, whether a fixed sum upon its whole tonnage, or a sum to be ascertained by comparing the amount of tonnage with the rate of duty.” Steamship Co., supra, at 35. And, summarizing earlier cases while speaking for a unanimous Court, Justice Stone concluded that the “prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port.” Clyde Mallory Lines, supra, at 265-266. Cf. Cannon v. New Orleans, 20 Wall. 577 (1874) (invalidating a tax imposed on ships entering a port, which tax was graduated based on the ships’ capacity and length of stay); Inman, supra (invalidating a fee imposed on ships of a certain capacity that entered a port); Steamship Co., supra (invalidating a flat tax imposed on every ship that entered a port, regardless of the ship’s capacity).
*9 Although the Clause forbids all charges, whatever their form, that impose “a charge for the privilege of entering, trading in, or lying in a port,” nothing in the history of the adoption of the Clause, the purpose of the Clause, or this Court’s interpretation of the Clause suggests that it operates as a ban on any and all taxes which fall on vessels that use a State’s port, harbor, or other waterways. See post, at 17 (Roberts, C. J., concurring in part and concurring in judgment). Such a radical proposition would transform the Tonnage Clause from one that protects vessels, and their owners, from discrimination by seaboard States, to one that gives vessels preferential treatment vis-a-vis all other property, and its owners, in a seaboard State. The Tonnage Clause cannot be read to give vessels such “preferential treatment.” Cf. Michelin Tire Corp. v. Wages, 423 U. S. 276, 287 (1976) (noting, in a related context, that the Import-Export Clause “cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies”). See also infra this page and 10-16.
B
1
Does the tax before us impose “a charge for the privilege of entering, trading in, or lying in a port”? Certainly, the ordinance that imposes the tax would seem designed to do so. It says that the tax applies to ships that travel to (and leave) the City’s port regularly for business purposes, that are kept in the City’s port, that take on more than $1 million in cargo in that port, or that are involved in business transactions in that amount there. In practice, the tax applied in its first year to 28 vessels, of which 24 were oil tankers, 3 were tugboats, and 1 was a passenger cruise ship. App. 53. The ordinance applies the tax to no other form of personal property. See Valdez Municipal Code §3.12.030(A)(2) (2008).
*10 Moreover, the tax’s application and its amount depend upon the ship’s capacity. That is to say, the tax applies only to large ships (those at least 95 feet in length), while exempting small ones. See § 3.12.020(A)(1).
Nor can Valdez escape application of the Clause by claiming that the ordinance imposes, not a duty or a tax, but a fee or a charge for “services rendered” to a “vessel,” such as “pilotage,” “wharfage,” “medical inspection,” the “use of locks,” or the like. Clyde Mallory Lines, 296 U. S., at 266; see also Inman, 94 U. S., at 243. To the contrary, the ordinance creates a tax designed to raise revenue used for general municipal services. See 182 P. 3d, at 623; Valdez, Alaska, Resolution No. 00-15, App. to Pet. for Cert. 53a-56a. Tonnage Clause precedent makes clear that, where a tax otherwise qualifies as a duty of tonnage, a general, revenue-raising purpose argues in favor of, not against, application of. the Clause. See Steamship Co., 6 Wall., at 34.
This case lies at the heart of what the Tonnage Clause forbids. The ordinance applies almost exclusively to oil tankers. And a tax on the value of such vessels is closely correlated with cargo capacity. Because the imposition of the tax depends on a factor related to tonnage and that tonnage-based tax is not for services provided to the vessel, it is unconstitutional.
The dissent contends that the tax does not operate as “a charge for the privilege of entering, trading in, or lying in a port,” Clyde Mallory Lines, supra, at 265-266 — that is, as an impermissible tonnage duty — because Valdez levies its tax only upon vessels that meet a “tax situs” requirement. See post, at 24-25 (opinion of Stevens, J.). But in this case, the distinction the dissent draws between tonnage duties and property taxes is a distinction without a difference. That is because to establish a tax situs under the tax challenged here, an oil tanker needs only to enter the port and load oil worth more than $1 million. And, as Polar Tankers notes, oil tankers routinely carry millions of barrels of oil at a time *11 worth well in excess of $1 million. Reply Brief for Petitioner 6. Thus, by virtue of a single entry into the port, “trading” once in that port, or “lying” once in that port, a tanker automatically establishes a tax situs in Valdez. No one claims that this basis for establishing a tax situs is insufficient under the Constitution. After all, a nondomiciliary jurisdiction may constitutionally tax property when that property has a “substantial nexus” with that jurisdiction, and such a nexus is established when the taxpayer “avails itself of the substantial privilege of carrying on business” in that jurisdiction. Mobil Oil Corp. v. Commissioner of Taxes of Vt., 445 U. S. 425, 443, 437 (1980) (internal quotation marks omitted). See also Japan Line, Ltd. v. County of Los Angeles, 441 U. S. 434, 441-445 (1979); Quill Corp. v. North Dakota, 504 U. S. 298, 312 (1992). Here, the City identified the 28 vessels that were subject to the tax in the year 2000. But the City fails to point to a single oil tanker, or any vessel greater than 95 feet in length, that both entered the port and failed to establish a tax situs. See App. 53. What else is needed to show that a tax characterized as one on property may nevertheless function as a “charge for the privilege of entering ... a port”?
2
Valdez does not deny that its tax operates much like a duty applied exclusively to ships. But, like the Alaska Supreme Court, it points to language in an earlier Court opinion explicitly stating that “[tjaxes levied . . . upon ships ... as property, based on a valuation of the same as property, are not within the prohibition of the Constitution.” State Tonnage Tax Cases, 12 Wall. 204, 213 (1871) (emphasis deleted); cf. 182 P. 3d, at 622, and n. 43. Valdez says that its tax is just such a value-related tax on personal property and consequently falls outside the scope of the Clause. Brief for Respondent 16-23.
Our problem with this argument, however, is that the Court later made clear that the Clause does not apply to *12 “taxation” of vessels “as property in the same manner as other personal property owned by citizens of the State.” “[W]here” vessels “are not taxed in the same manner as the other property of the citizens,” however, the “prohibition . . . comes into play.” Wheeling, 99 U. S., at 284 (emphasis added).
Viewed in terms of the purpose of the Clause, this qualification is important. It means that, in order to fund services by taxing ships, a State must also impose similar taxes upon other businesses. And that fact may well operate as a cheek upon a State’s ability to impose a tax on ships at rates that reflect an effort to take economic advantage of the port’s geographically based position. After all, the presence of other businesses subject to the tax, particularly businesses owned and operated by state residents, threatens political concern and a potential ballot-box issue, were rates, say, to get out of hand. See Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots, 12 How. 299, 315 (1852); cf. South Carolina Highway Dept. v. Barnwell Brothers, Inc., 303 U. S. 177, 185, n. 2 (1938) (when state action affecting interstate commerce “is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state”).
Moreover, and at the very least, a “same manner” requirement helps to ensure that a value-related property tax differs significantly from a graduated tax on a ship’s capacity and that the former is not simply a redesignation of the latter. See Packet Co., 95 U. S., at 88 (“ ‘It is the thing and not the name that is to be considered’” (quoting Cooley, supra, at 314)).
In our view, Valdez fails to satisfy this requirement. It does not tax vessels “in the same manner as other personal property” of those who do business in Valdez. Wheeling, *13 supra, at 284. We can find little, if any, other personal property that it taxes. According to the State of Alaska, Valdez specifically exempts from property taxation motor vehicles, aircraft, and other vehicles, as well as business machinery. See Dept, of Community and Economic Development, Division of Community and Business Development, Office of the State Assessor, Alaska Taxable 2001, p. 20 (Jan. 2002) (Table 4), online at http://www.commerce.state.ak.us/dca/ Taxable/AKTaxable2001.pdf (as visited June 10, 2009, and available in Clerk of Court’s case file).
We concede, as Valdez points out, that a different Valdez ordinance imposes what it characterizes as a value-based property tax on mobile homes, trailers, and recreational vehicles. Valdez Municipal Code §3.12.022 (2008); Brief for-Respondent 24-25. But that same ordinance exempts those vehicles from its property tax unless they are “affixed” to a particular site. Hence, whatever words the City uses to describe the tax imposed on mobile homes, trailers, and recreational vehicles, Valdez in fact taxes those vehicles only when they constitute a form, not of personal property, but of real property (like a home). See §3.12.022 (providing that “trailers and mobile homes” are “subject to taxation” when they are classified as “real property”).
Valdez also points to a separate city ordinance that imposes a tax “on all taxable property taxable under Alaska Statutes Chapter 43.56.” §3.28.010 (2008). The Alaska Statutes Chapter identifies as taxable “aircraft and motor vehicles” the operation of which “relates to” the “exploration for, production of, or pipeline transportation of gas or unrefined oil.” Alaska Stat. §43.56.210 (2008). Valdez claims that its tax on ships is simply another form of this value-related tax on oil-related property.
Valdez did not make this claim in the lower courts, however. Nor does the State of Alaska (which has filed a brief in support of Valdez) support this particular claim. Brief *14 for State of Alaska et al. as Amici Curiae 82-33. Thus, we lack the State’s explanation of just how the tax on oil-related vehicles works. And, lacking precise information, we might ordinarily decline to consider this claim. See, e. g., Clingman v. Beaver, 544 U. S. 581, 597-598 (2005).
Nonetheless, the parties have argued the matter in their briefs here; and our deciding the matter now will reduce the likelihood of further litigation. We may make exceptions to our general approach to claims not raised below; and for these reasons we shall do so. See Granfinanciera, S. A. v. Nordberg, 492 U. S. 33, 39 (1989).
Addressing the claim on the basis of the briefs and what we have gleaned from publicly available sources, we note that Valdez’s ship tax differs from the tax on other oil-related property in several ways. The former is a purely municipal tax. The City imposes it; the City alone determines what property is subject to the tax; the City establishes the rate of taxation; the City values the property; the City resolves evaluation disputes; the City issues assessment notices; the City collects the tax; and the City (as far as we can tell) keeps the revenue without any restrictions. See Valdez Municipal Code § 3.12.020(A)(1) (2008); §3.12.060; § 3.12.020(B); §§3.12.090-3.12.100; § 3.12.210(A) (2001); Valdez, Alaska, Resolution No. 00-15, App. to Pet. for Cert. 53a-56a.
The latter is primarily a state-level tax. The State imposes it. In fact, Valdez’s city manager characterized the oil-property tax as involving “property taxed by the State ... and [raising revenue] subsequently shared with the City.” App. 46 (affidavit of Dave Dengel). In addition, the State determines the type of property subject to the tax; the State forbids the municipality to exempt any property it designates as taxable; the State regulates the rate of taxation that may be applied to property it designates as taxable; the State issues assessment notices; the State resolves evaluation disputes; and the State, while permitting the municipality to set the precise tax rate and to collect the tax, im *15 poses certain kinds of limits upon the amount of the resulting revenue that the municipality may raise that, in effect, provide a check against excessive rates. See Alaska Stat. § 43.56.010(b) (2008); §43.56.210(5)(A); 15 Alaska Admin. Code §56.010 (2009); §§56.015-56.040; Alaska Stat. §§ 29.45.080(b), (c) (2008); § 43.56.010(c).
These differences matter. For one thing, they mean that any ordinary oil-related business, other than ships, that finds the tax imposed upon its movable property too burdensome must complain to the State, not to the City, for it is the State that is in charge of .setting the manner of assessment and valuation. At the same time, an oil tanker that finds the vessel tax too burdensome must complain to the City, not to the State, for the State has nothing to do with the rate, valuation, or assessment of that particular tax.
For another thing, they mean that there is no effective electorate-related check (comparable to the check available where a property tax is more broadly imposed) upon the City’s vessel-taxing power. The City’s property tax hits ships and only ships; it is not constrained by any need to treat ships and other business property alike. Taken together, these two considerations mean that Valdez’s property tax lacks the safeguards implied by this Court’s statements that a property tax on ships escapes the scope of the Tonnage Clause only when that tax is imposed upon ships “in the same manner” as it is imposed on other forms of property.
The Chief Justice contends that a State may never impose a property tax on a vessel belonging to a citizen of another State, even if that vessel is taxed in the “same manner” as other personal property in the taxing State. See post, at 17-18 (opinion concurring in part and concurring in judgment). But, as The Chief Justice concedes, this Court held in the State Tonnage Tax Cases and Wheeling that vessels belonging to a State’s own citizens may be subject to a property tax when the vessels are taxed in the same manner as other personal property owned by citizens of that *16 State. At the time those cases were decided, the home port doctrine was still in effect, which meant that vessels were taxable solely by the owner’s domicil State. Since the State Tonnage Tax Cases and Wheeling, the home port doctrine has been abandoned, and States are now permitted to tax vessels belonging to citizens of other States that develop a tax situs in the nondomiciliary State, provided the tax is fairly apportioned. See, e.g., Ott v. Mississippi Valley Barge Line Co., 336 U. S. 169, 172-174 (1949); Japan Line, 441 U. S., at 442-443. Given this evolution in the law governing interstate taxation since our decisions in the State Tonnage Tax Cases and Wheeling, there is little reason to think that the ability of a State to tax vessels in the “same manner” as other personal property applies only to vessels owned by citizens of the taxing State. In any event, we need not decide this issue because it is clear that the vessels subject to the City’s ordinance are not taxed in the same manner as other personal property.
As far as we can tell, then, Valdez applies a value-based personal property tax to ships and to no other property at all. It does so in order to obtain revenue for general city purposes. The tax, no less than a similar duty, may (depending upon rates) “ta[x] the consumption” of those in other States. See 3 Records of the Federal Convention of 1787, at 519 (reprinting letter from James Madison to Professor Davis, 1832). It is consequently the kind of tax that the Tonnage Clause forbids Valdez to impose without the consent of Congress, consent that Valdez lacks.
* * *
We conclude that the tax is unconstitutional. We reverse the contrary judgment of the Supreme Court of Alaska. And we remand the case for further proceedings.

It is so ordered.