Argued and submitted May 6, judgment of Tax Court affirmed
December 23, 2021

OOMA, INC.,
a foreign corporation,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent.*

(TC 5331) (SC S067581)

501 P3d 520

Taxpayer provided Oregon customers with Voice over Internet Protocol (VoIP) services, including access to Oregon's emergency communication system. Oregon imposes a tax on VoIP lines connecting to its emergency communication system and requires the VoIP provider to collect a tax from its customers and remit the collected amounts to the Department of Revenue. Taxpayer, a California company, argued that requiring it to collect and remit that tax violated the Due Process Clause and the Commerce Clause. The Tax Court rejected those arguments based on a stipulated factual record and granted summary judgment to the Department of Revenue. The stipulated factual record documented taxpayer's efforts to attract Oregon customers and the services that taxpayer provided in Oregon to those customers. *Held*: (1) The stipulated factual record established that taxpayer purposefully availed itself of Oregon's market, satisfying the Due Process Clause; and (2) the stipulated factual record established that taxpayer availed itself of the substantial privilege of carrying on business in Oregon, satisfying the Commerce Clause.

The judgment of the Tax Court is affirmed.

En Banc

On appeal from the Oregon Tax Court.*

Robert T. Manicke, Judge.

Michael J. Bowen, Akerman, LLP, Jacksonville, Florida, argued the cause for appellant. Casey M. Nokes, Cable Huston LLP, Portland, filed the briefs.

Darren Weirnick, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. Also on

_____

* *Ooma, Inc. v. Dept. of Rev.*, TC 5331, WL 1035995 (Or Tax, March 2, 2020).

the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

GARRETT, J.

The judgment of the Tax Court is affirmed.

## GARRETT, J.

The Due Process Clause and the Commerce Clause of the United States Constitution limit the authority of states to impose tax obligations on out-of-state residents. US Const, Amend XIV (Due Process Clause); US Const, Art I, § 8, cl 3 (Commerce Clause). This case requires us to determine whether taxpayer, Ooma, Inc., a California company, had sufficient contacts or nexus with Oregon to satisfy those constitutional standards. The Tax Court concluded that Ooma's contacts and nexus with Oregon were sufficient to satisfy those standards and granted summary judgment to the Department of Revenue (department). For the reasons explained below, we affirm the judgment of the Tax Court.

## I.   BACKGROUND

We take the following undisputed facts from the record on summary judgment, viewing the evidence and all reasonable inferences from that evidence in the light most favorable to Ooma, as the nonmoving party. *Portfolio Recovery Associates, LLC v. Sanders*, 366 Or 355, 357, 462 P3d 263 (2020). The relevant tax period covers 39 months, from January 2013 through March 2016. During that time, Ooma provided Voice over Internet Protocol (VoIP) services to customers nationwide, including in Oregon. VoIP services allow customers to make phone calls using a broadband internet connection.

Federal law requires VoIP providers to ensure that their customers have access to local emergency communication systems when calling 9-1-1. 47 CFR § 9.5 (2015). That access is provided through something called "E911." Ooma complied with the federal requirement and provided its Oregon customers with E911 access to Oregon's emergency communication system.

In exchange for access to its emergency communication system, Oregon imposes a tax on VoIP lines, the revenues from which are used solely to maintain and improve the system. ORS 403.245(1) (2015). The VoIP provider is required to collect the E911 tax from its customers and remit the collected amounts to the department with a quarterly tax return. ORS 403.215(1)-(2) (2015). During the

time period at issue, the tax for each VoIP line was $0.75 per month. ORS 403.200(1) (2015). Ooma neither collected nor remitted the E911 tax during the relevant time period.

The department issued Ooma notices of assessment regarding the unpaid E911 taxes. Ooma appealed those notices. Ooma concedes, for the purposes of this appeal, that ORS 403.215 required it to collect and remit the E911 tax. But Ooma argued to the Tax Court that subjecting Ooma to ORS 403.215 violated the Due Process Clause and the Commerce Clause. According to Ooma, it had neither sufficient contacts with Oregon to satisfy due process standards nor a sufficient nexus with Oregon to satisfy Commerce Clause standards.

With regard to those constitutional challenges, Ooma and the department filed competing motions for summary judgment based on a stipulated factual record. That record reveals that Ooma is headquartered in California. During the relevant time, Ooma had no physical presence and owned no property in Oregon. Ooma also had no employees in Oregon and hired no independent agents in Oregon. It did not seek or otherwise have any license or permits from any government entity in Oregon.

To access Ooma's VoIP services, customers entered a service contract with Ooma and had to use Ooma's equipment, which they could acquire directly from Ooma's website or through third-party retailers, including brick-and-mortar retailers in Oregon. Ooma retained no ownership interest in the purchased equipment. In addition to Ooma's equipment, customers were also required to have broadband internet service through an independent internet service provider. Ooma did not provide internet access.

The parties stipulated to these facts about Ooma's conduct soliciting and otherwise attempting to acquire customers in Oregon:

> "Ooma prepared marketing plans that targeted customers nationwide, including Oregon residents."

> "Ooma employed business strategies that targeted customers nationwide, including Oregon residents."

"Ooma provided promotional and marketing materials to select national retailers for use in their retail locations, including retail locations in Oregon. In these instances, the retailer decided where and when to use the Ooma promotional marketing materials."

"On certain occasions, at the direction of a national retailer, Ooma shipped promotional and marketing material to the retailer's location(s) in the State of Oregon."

The number of Ooma's VoIP lines provided to Oregon customers during the relevant time period ranged from 6,633 to 13,467. The service billings for those lines generated $2.2 million in revenue for Ooma.

The Tax Court granted the department's summary judgment motion, and denied Ooma's summary judgment motion, after concluding that Ooma's contacts and nexus with Oregon were sufficient to satisfy federal constitutional standards. Ooma appeals that decision to this court.

## II. ANALYSIS

On appeal from a grant of summary judgment, we consider whether the Tax Court erred in concluding that there was no genuine issue of material fact and that the department was entitled to summary judgment as a matter of law. *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 533, 316 P3d 276 (2013). The question is whether the undisputed facts establish that Ooma's contacts and nexus with Oregon were sufficient to satisfy the constitutional standards imposed by the Due Process Clause and the Commerce Clause.

### A. *Due Process Clause*

"In the context of state taxation, the Due Process Clause limits States to imposing only taxes that bear fiscal relation to protection, opportunities and benefits given by the state." *North Carolina Dept. of Revenue v. The Kimberley Rice Kaestner 1992 Family Trust*, ___ US ___, ___, 139 S Ct 2213, 2219, 204 L Ed 2d 621 (2019) (internal quotation marks and citation omitted). There are two steps in that analysis. First, "there must be some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Id.* at ___, 139 S Ct at 2220 (internal citation and quotation marks omitted). Second,

"the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State." *Id.* at ___, 139 S Ct at 2220 (internal citation and quotation marks omitted).

In this appeal, Ooma takes issue only with the first step, whether Ooma had a sufficient connection to Oregon. Under United States Supreme Court case law, the test for assessing a taxpayer's minimum connection to a taxing state is "borrow[ed] from the familiar test" for establishing specific personal jurisdiction under the Due Process Clause. *Id.* at ___, 139 S Ct at 2220. Thus, "[a] State has the power to impose a tax only when the taxed entity has 'certain minimum contacts' with the State such that the tax 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at ___, 139 S Ct at 2220 (quoting *International Shoe Co. v. Washington*, 326 US 310, 316, 66 S Ct 154, 90 L Ed 95 (1945)).

"The minimum contacts inquiry is flexible and focuses on the reasonableness of the government's action. Ultimately, only those who derive benefits and protection from associating with a State should have obligations to the State in question." *Id.* at ___, 139 S Ct at 2220 (internal quotation marks and citation omitted). The test for minimum contacts may be satisfied by establishing that the taxed party "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 US 235, 253, 78 S Ct 1228, 2 L Ed 2d 1283 (1958). The purposeful availment standard is intended to ensure that "individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," thus allowing them "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them" subject to another jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985) (internal citations and quotation marks omitted). A party may not be subject to the jurisdiction of a state based on contacts that are "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 US 770, 774, 104 S Ct 1473, 79 L Ed 2d 790 (1984).

Ooma argues that the undisputed facts in this case fail to establish that it purposefully availed itself of the Oregon market. We reject that argument. As described above, the facts demonstrate that Ooma's contacts with Oregon were not random, isolated, or fortuitous but were, instead, the result of its intentional efforts to serve the Oregon market. Ooma developed marketing plans and employed business strategies intended to reach Oregon residents (along with residents of other states), shipped products directly into Oregon, and engaged retailers to sell its products in Oregon. As a result of those efforts, Ooma established thousands of VoIP lines for Oregon customers and entered into ongoing commercial relationships with those customers requiring Ooma to provide services to those customers in Oregon. The services that Ooma provided included the conduct triggering the tax obligations at issue in this case—namely, providing access to Oregon's emergency communication system.[1]

That cumulative conduct—the efforts to attract Oregon customers and the services provided in Oregon to those customers—establishes Ooma's purposeful availment of the Oregon market. *See Walden v. Fiore*, 571 US 277, 285, 134 S Ct 1115, 188 L Ed 2d 12 (2014) ("[W]e have upheld the assertion of jurisdiction over defendants who have purposefully reach[ed] out beyond their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." (Internal citation and quotation marks omitted.)).

Ooma cites no decision from any jurisdiction concluding that such extensive contacts fail to establish purposeful availment. And, as the department points out, Ooma's contacts with Oregon far exceed what this court held sufficient to establish purposeful availment in *Willemsen v. Invacare Corp.*, 352 Or 191, 282 P3d 867 (2012). In that case, the manufacturer of wheelchair battery chargers, CTE, was sued in Oregon for injuries resulting from an alleged

---

[1] Ooma suggests that, because federal law requires it to provide its customers in Oregon with access to Oregon's emergency communication systems, the provision of that service cannot be considered as part of the purposeful availment analysis. Ooma cites no authority establishing the constitutional significance of that fact.

defect in its product. *Id.* at 195. This court concluded that CTE had purposefully availed itself of the Oregon market, and therefore could be subject to jurisdiction here, based largely on the regularity with which wheelchairs containing its battery chargers were sold in Oregon. Over a two-year span preceding the injuries, more than 1,100 wheelchairs were sold in Oregon containing CTE's battery chargers. *Id.* at 203. CTE was paid $30,929 for those battery chargers, which were built to the specifications of the wheelchair manufacturer. *Id.* at 195-96. Ooma's contacts with Oregon were more extensive than CTE's contacts. Unlike Ooma, CTE had no direct contacts with the Oregon market, either in soliciting customers or providing ongoing services to customers. During the relevant 39 months at issue, Ooma earned $2.2 million in revenue directly from Oregon purchasers of its VoIP services.[2]

In attempting to avoid the conclusion that it purposefully availed itself of the Oregon market, Ooma does not contend that *Willemsen*, as a products liability case, is inapt or that the department's argument misapplies *Willemsen* or misrepresents the extent of Ooma's contacts in Oregon. Instead, Ooma presents its own argument based on another products liability case, *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US 873, 131 S Ct 2780, 180 L Ed 2d 765 (2011). That argument has two steps. First, Ooma argues that this case presents novel facts that require us to apply a test for purposeful availment articulated in Justice Kennedy's noncontrolling plurality opinion in *Nicastro*.[3] Second, according to Ooma, applying Justice Kennedy's *Nicastro* opinion to the facts of this case requires concluding that Ooma did not purposefully avail itself of Oregon's market. We need not address the first step in Ooma's argument because we

---

[2] Ooma also generated additional revenue from the direct sale of its equipment to Oregon consumers, although the record is unclear as to the extent or value of those sales.

[3] On this point, Ooma notes that Justice Breyer's controlling opinion in *Nicastro* concluded that, because the facts of that case did "not implicate modern concerns," the case was "an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules." *Nicastro*, 564 US at 890 (Breyer, J., concurring). Ooma argues that this case implicates those modern concerns and that only the test articulated by Justice Kennedy properly accounts for those concerns.

conclude that the argument fails at the second step. That is, even under the test described in that plurality opinion (assuming that it is both controlling and applicable here), Ooma still purposefully availed itself of the Oregon market.

The plaintiff in *Nicastro* was injured in New Jersey while using a large industrial metal shearing machine made by the defendant, J. McIntyre Machinery. *Id.* at 878. The plaintiff sued McIntyre in a New Jersey court. McIntyre was a British company with no direct contacts in New Jersey and no direct sales to customers in the United States. Instead, McIntyre engaged an independent distributor to sell its products in the United States. *Id.* Other than the marketing efforts of the distributor, McIntyre's own marketing efforts in the United States were limited to sending its executives to an annual trade show in the United States to present their products. Those trade shows were never held in New Jersey, and the record contained no evidence as to whether those executives were aware of New Jersey residents attending the trade shows. The volume of sales was small. No more than four (possibly as few as one) of McIntyre's products ended up in New Jersey. *Id.*

Although a majority of the Court agreed that the record failed to establish that McIntyre purposefully availed itself of the New Jersey market, a majority did not agree on the reasoning that supported that conclusion. Justice Breyer wrote a narrow concurring opinion, joined by Justice Alito, which represents the controlling opinion in the case. *See Willemsen*, 352 Or at 201 ("[W]e look to Justice Breyer's opinion concurring in the judgment for the 'holding' in *Nicastro* that guides our resolution of this case[.]"). Justice Breyer concluded that the facts of *Nicastro* did not present an opportunity to announce new law, because the conclusion that McIntyre did not purposefully avail itself of the New Jersey market was compelled by existing case law: "None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient." *Nicastro*, 564 US at 888 (Breyer, J., concurring).

Justice Kennedy wrote a plurality opinion joined by three other members of the Court, which provides the grounds for Ooma's argument in this case. Justice Kennedy

wrote that he would have used *Nicastro* to resolve a conflict between competing nonmajority opinions by Justice Brennan and Justice O'Connor in *Asahi Metal Industry Co. v. Superior Court of California*, 480 US 102, 107 S Ct 1026, 94 L Ed 2d 92 (1987).

In *Asahi*, Justice Brennan had reasoned that a manufacturer with no direct contact to the forum state purposefully avails itself of that state's market when the manufacturer knows that "the regular and anticipated flow" of commerce brings the manufacturer's products into that state, thus establishing the manufacturer's reasonable expectation that its products will end up there. *Id.* at 117 (Brennan, J., concurring). Justice O'Connor had rejected that standard as too permissive. According to Justice O'Connor, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112 (O'Connor, J., plurality opinion). She would have required that the out-of-state party engage in some "[a]dditional conduct *** [that] indicate[s] an intent or purpose to serve the market in the forum State." *Id.* In Justice O'Connor's view, such additional conduct might include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

Justice Kennedy's opinion in *Nicastro* would have rejected Justice Brennan's test in favor of Justice O'Connor's. *Nicastro*, 564 US at 883 (Kennedy, J., plurality opinion) (concluding, after describing the competing tests, that "Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power"). Echoing Justice O'Connor's emphasis on the defendant's intent and purpose, Justice Kennedy wrote that "[t]he principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Id.* at 882. Further, according to Justice Kennedy, "[t]he defendant's transmission of goods permits the exercise of jurisdiction

only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.*

Justice Kennedy then explained that assessing the sufficiency of a party's contact "requires a forum-by-forum, or sovereign-by-sovereign, analysis." *Id.* at 884. As a result, "[b]ecause the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State," although Justice Kennedy thought that that "would be an exceptional case." *Id.* Justice Kennedy concluded that, by engaging a United States distributor and attending national trade shows in the United States, McIntyre merely "directed marketing and sales efforts at the United States," thus subjecting itself to the potential jurisdiction of the federal government, if a federal law applied. *Id.* at 885. But, according to Justice Kennedy, McIntyre had not "engaged in conduct purposefully directed at New Jersey." *Id.* at 886.

Ooma argues that it is like McIntyre, in that Ooma targeted its marketing and sales efforts at the entire country but not at Oregon or any other particular state. Ooma relies on the stipulated facts that Ooma "prepared marketing plans that targeted customers nationwide, including Oregon residents" and "employed business strategies that targeted customers nationwide, including Oregon residents." In its briefing to this court, Ooma argues that those facts do not establish that it purposefully availed itself of Oregon's market because "Ooma did not tailor its business plans, advertising, or online presence to focus its solicitation efforts on Oregon residents."

Ooma's argument appears to take Justice Kennedy's opinion to mean that conduct "targeting a forum" means conduct targeting that forum to the exclusion of other forums. However, that opinion did not suggest that a party's single course of conduct cannot target multiple forums at the same time. As we understand it, Justice Kennedy's conclusion that McIntyre targeted "the United States" rather than New Jersey was based on the fact that McIntyre's effort to reach customers in New Jersey was so limited, not because

its effort to reach customers in other states was so wide-spread. Nothing in Justice Kennedy's opinion indicates that, if a court finds contacts sufficient to support a conclusion that a company *has* targeted a state, the court should none-theless avoid that conclusion based on a finding that the company's efforts targeted other states as well. As a result, Ooma's effort to target customers in other states does not affect or diminish the constitutional significance of its effort to target customers in Oregon.[4]

Additionally, by focusing only on its conduct to attract customers and ignoring its conduct providing ser-vices in Oregon, Ooma takes an unduly narrow view of what constitutes "targeting" in Justice Kennedy's opinion. Justice Kennedy referred to McIntyre's "marketing and sales activ-ities," *id.* at 885, because that was the only conduct that McIntyre engaged in that arguably constituted targeting. It does not follow that other types of activities are irrelevant to the analysis, so long as they inform the question of whether the party (in Justice Kennedy's words) "manifest[ed] an intention to submit to the power of a sovereign." *Id.* at 882. Here, Ooma not only engaged in marketing and sales activi-ties, it actually entered into contracts and provided services to Oregon residents, in Oregon. We readily conclude that,

---

[4] In an effort to buttress its argument that purposeful availment can be sat-isfied only through conduct specific to each state, Ooma cites *Quill Corp. v. North Dakota*, 504 US 298, 112 S Ct 1904, 119 L Ed 2d 91 (1992), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, ___ US ___, 138 S Ct 2080, 201 L Ed 2d 403 (2018). In *Quill*, the Court concluded that a state did not violate the Due Process Clause by imposing a duty to collect use taxes on an out-of-state mail-order company that annually delivered 24 tons of catalogs and flyers into the state, which generated almost $1 million in annual sales made to about 3,000 customers. *Id.* at 302, 304, 308. Ooma maintains that, "[u]nlike the taxpayer in *Quill*, Ooma did not pursue Oregon sales by pinpointing individual Oregon resi-dents or businesses."

But the Court in *Quill* never identified the manner of solicitation—that is, whether the solicitation was sent to an individual or broadcast to many individuals—as relevant to its analysis. In fact, the Court suggested that the manner of solic-itation was not relevant. After noting that the mail-order company "engaged in continuous and widespread solicitation of busines" within the taxing state, the Court held that, "[i]n 'modern commercial life[,]' it matters little that such solic-itation is accomplished by a deluge of catalogs rather than a phalanx of drum-mers." *Id.* at 308. Further, such a distinction based on the manner of solicitation would be in tension with the Court's effort to "abandon[] more formalistic tests *** in favor of a more flexible inquiry" into the reasonableness of the government action. *Id.* at 307.

even under the test that Justice Kennedy articulated, Ooma purposefully availed itself of Oregon's market.[5]

## B. *Commerce Clause*

Under the Commerce Clause, a state tax will be sustained so long as it "applie[s] to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 279, 97 S Ct 1076, 51 L Ed 2d 326 (1977). In this case, Ooma challenges only the "substantial nexus" part of the test. The parties agree that "'[s]uch a nexus is established when the taxpayer [or collector] avails itself of the substantial privilege of carrying on business in that jurisdiction.'" *South Dakota v. Wayfair, Inc.*, ___ US ___, ___, 138 S Ct 2080, 2099, 201 L Ed 2d 403 (2018) (quoting *Polar Tankers, Inc. v. City of Valdez*, 557 US 1, 11, 129 S Ct 2277, 174 L Ed 2d 1 (2009)). The parties disagree, however, as to the facts necessary to satisfy that standard.

Both parties ground their arguments in the Court's analysis of the nexus issue in *Wayfair*. In that case, the taxing state, South Dakota, enacted a statute requiring out-of-state retailers—those without a physical presence in the state—to collect and remit sales taxes. The statute applied only to those retailers that annually delivered more than $100,000 of goods or services into South Dakota or engaged in 200 or more separate transactions for the delivery of goods or services into South Dakota. *Id.* at ___, 138 S Ct at 2089.

The primary question for the Court in *Wayfair* was whether to affirm or abandon precedent holding that a state violates the Commerce Clause by imposing a sales tax on retailers without a physical presence in the state. *See Quill*, 504 US at 317-18 (applying the physical-presence rule); *National Bellas Hess, Inc. v. Department of Revenue of Ill.*, 386 US 753, 758, 87 S Ct 1389, 18 L Ed 2d 505 (1967)

---

[5] Ooma separately argues that requiring it to comply with the E911 tax obligations violates traditional notions of "fair play and substantial justice." *See Burger King*, 471 US at 476. We reject that argument, which largely overlaps with Ooma's arguments about minimum contacts and purposeful availment.

(same). After deciding to abandon the physical-presence rule by overruling its prior cases, the Court had no trouble concluding that the out-of-state retailers challenging the tax had availed themselves of the substantial privilege of carrying on business in that state, thus satisfying the substantial nexus requirement:

> "Here, the nexus is clearly sufficient based on both the economic and virtual contacts respondents have with the State. The Act applies only to sellers that deliver more than $100,000 of goods or services into South Dakota or engage in 200 or more separate transactions for the delivery of goods and services into the State on an annual basis. This quantity of business could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota. And respondents are large, national companies that undoubtedly maintain an extensive virtual presence. Thus, the substantial nexus requirement of *Complete Auto* is satisfied in this case."

*Wayfair*, ___ US at ___, 138 S Ct at 2099 (internal citation omitted).

Both parties contend that the quoted paragraph supports their respective positions. The department reads that paragraph to mean that retailers that annually do more than $100,000 worth of business in a state, or engage in more than 200 transactions, meet the substantial nexus requirement as set out in *Wayfair*. Because Ooma did more than $2.2 million in business in 39 months[6] and provided thousands of lines of VoIP service, the department reasons, the substantial nexus test is easily satisfied.

Ooma argues that the quoted paragraph indicates that a court assessing whether the substantial nexus requirement has been satisfied must determine the extent of the company's economic activity in the state. It is not enough, according to Ooma, to simply establish that a company did more than $100,000 worth of business in a state or engaged in more than 200 transactions. And Ooma argues that a court may not conclude that an out-of-state company satisfies the substantial nexus requirement without finding

---

[6] Ooma's services to Oregon customers generated monthly revenue ranging from $32,222.04 to $102,096.87.

that the company maintains an "extensive virtual presence." *Id.* at ___, 138 S Ct at 2099.

Ooma's reading is unpersuasive. The Court explained in *Wayfair* that the sales in excess of South Dakota's thresholds "could not have occurred unless the seller availed itself of the substantial privilege of carrying on business" in the state. *Id.* It necessarily follows that a company that earned far greater revenue and engaged in far more transactions than involved in *Wayfair* must be deemed to have also availed itself of the substantial privilege of carrying on business in Oregon. And, while the Court noted that the taxpayers in *Wayfair* undoubtedly had an extensive virtual presence, the Court did not articulate that as a requirement, and Ooma offers no explanation as to why it would make sense to impose such a requirement when a nexus is otherwise established through sales, marketing, and service delivery efforts. *See* Jerome R. Hellerstein & Walter Hellerstein, 2 *State Taxation* ¶ 19.02[2][c][i], 19-30 n 142 (3rd ed Supp 2018) ("Clearly, a virtual presence (in the modern sense of having a website) is not required to establish substantial nexus. For example, a traditional mail-order company like National Bellas Hess, Inc. or Quill Corporation would have substantial nexus with South Dakota if its in-state sales or transactions exceeded the minimum thresholds prescribed by the South Dakota statute."). As a result, the lack of record evidence as to Ooma's virtual presence does not establish a genuine issue of material fact that precludes the grant of summary judgment to the department.

The judgment of the Tax Court is affirmed.